

**NUMBER 13-09-00027-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

CECILIO MENDOZA,                                         **Appellant,**

**v.**

THE STATE OF TEXAS,                                       **Appellee.**

---

### On appeal from the 357th District Court of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Vela, and Perkes
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Cecilio Mendoza, of attempted capital murder and burglary of a habitation with intent to commit robbery, and sentenced him to forty-seven years' imprisonment on the attempted capital murder offense and fifteen years' imprisonment on the burglary of a habitation offense, to be served concurrently. *See* TEX. PENAL CODE ANN. §§ 15.01 (West 2003), 19.03(a)(2) (West Supp. 2010),

30.02(a)(1), (d) (West 2003). By eight issues, appellant challenges: (1) the sufficiency of the evidence to support his conviction for attempted capital murder (issues one and two); (2) the trial court's refusal to submit an instruction on the lesser-included offense of manslaughter (issue three); (3) the admission of his two statements on grounds they were involuntary (issues four and five); (4) the trial court's refusal to instruct the jury on the voluntariness of his two statements (issue six); (5) the trial court's failure to make findings of fact and conclusions of law regarding the voluntariness of his two statements (issue seven); and (6) the admission of a "3D" exhibit and accompanying testimony of a police officer (issue eight). We affirm.

## I. BACKGROUND

In the early morning hours of February 26, 2007, appellant and an acquaintance, Jose Limon, wearing ski masks and carrying guns, entered the home of the Vallejo family in Brownsville, Texas. One of the family members escaped and called 911. Police officers arrived, entered the house, and a shootout ensued. Limon died at the scene. Officer Rolando Trujillo suffered multiple injuries, but survived. Appellant attempted to escape by jumping through a window, but the police apprehended him nearby. Appellant gave two statements to the police: (1) the first taken the day following the incident, at the hospital, where he was receiving treatment for his injuries; and (2) the second, taken four days later on March 2, 2007.

## II. VOLUNTARINESS ISSUES

We first address appellant's issues concerning the admissibility of his two written statements.

### A. Trial Court's Findings of Fact and Conclusions of Law

By his seventh issue, appellant contends the trial court erred in failing to make findings of fact and conclusions of law regarding the voluntariness of his two

statements, as required by article 38.22, section six of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (West 2005). In response to this issue, we abated this cause for compliance with section six of article 38.22. *See id.*; *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004) (en banc) ("The proper procedure is that the trial judge be directed to make the required written findings of fact and conclusions of law."). Pursuant to our request, the trial court submitted findings of fact and conclusions of law, and such findings and conclusions have been timely filed with this Court. Accordingly, appellant's seventh issue is overruled as moot.

## B. Voluntariness of Statements

By his fourth issue, appellant contends that his first statement—taken at the hospital on the afternoon following the incident—was involuntary because he was (a) intoxicated due to his use of crack cocaine before the robbery and (b) "suffering from the pain and effects of a gunshot wound." By his fifth issue, he contends that his second statement was involuntary because he "did not fully understand the rights he was abandoning" and "did not want to give another statement."

### 1. Standard of Review and Applicable Law

Whether a confession is voluntary is a mixed question of law and fact. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000); *see Crenshaw v. State*, No. 01-09-791-CR, 2011 Tex. App. LEXIS 665, at *32 (Tex. App.–Houston [1st Dist.] Jan. 27, 2011, no pet.) (mem. op., not designated for publication). We give great deference to the trial court's determinations of historical fact supported by the record, especially when those findings are based on an evaluation of credibility and demeanor of the witnesses. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford the same amount of deference to trial court rulings on mixed questions of law and fact when the resolution of those ultimate issues turns on an evaluation of credibility and demeanor.

3

*Id.* However, we review de novo mixed questions of law and fact that do not fit within that category. *Id.*

A confession is involuntary or coerced if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will. *See Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (citing *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991)); *Martinez v. State*, No. 13-00-227-CR, 2001 Tex. App. LEXIS 4699, at *14 (Tex. App.–Corpus Christi July 12, 2001, pet. ref'd). The court of criminal appeals has explained:

> Under Article 38.21, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. It may be involuntary under one, two, or all three theories. A statement that is "involuntary" as a matter of constitutional law is also "involuntary" under Article 38.22, but the converse need not be true. The theory of involuntariness determines whether and what type of an instruction may be appropriate. Thus, the first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness.

*Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (footnotes omitted). The court has also held that although "youth, intoxication, mental retardation, and other disabilities are usually not enough, by themselves, to render a statement inadmissible under [a]rticle 38.22, they are factors that a jury, armed with a proper instruction, is entitled to consider." *Id.* at 173.

### 2. Trial Court's Findings of Fact and Conclusions of Law

The trial court submitted the following findings and conclusions:

FINDINGS OF FACT

1.  Defendant Cecilio Mendoza was charged with attempted capital murder and burglary of a habitation with intent to commit robbery, a felony.

4

2. Prior to the incident in question, Defendant admitted to using narcotics.

3. Defendant was involved in a firefight with officers from the Brownsville Police Department.

4. One of those officers, Officer Rolando Trujillo, was wounded by a round fired from the Defendant's gun.

5. Defendant was wounded by return fire from Trujillo's duty weapon, as well as by jumping through a glass window in an attempt to escape.

6. Defendant was immediately taken to the hospital upon his apprehension.

7. Defendant was given his Miranda rights at the hospital.

8. Hospital staff informed the investigating Officer Thomas Clipper that Defendant was capable of making a statement.

9. No medical expert testified for the defense as to the Defendant's purported intoxication either before or during the taking of the first statement.

10. Defendant made a second, written statement to the police on March 2, 2007.

11. The second statement was made after a valid, written waiver of *Miranda* rights was signed by Defendant.

12. Defendant has not made a challenge to his second statement's voluntariness, except to say that he felt "burned" by giving the first statement and so made the second one.

CONCLUSIONS OF LAW

1. Defendant's first statement was voluntarily given.

2. Injury and intoxication are, without some other evidence suggestive of a lack of voluntariness, insufficient as a matter of law to declare a statement involuntary.

3. No evidence supports Defendant's theory that he was so intoxicated and/or medicated for his injuries that he was not aware of his rights.

4. Defendant waived his rights before giving his first statement.

5

5. Defendant's first statement was not the product of an overborne will.

6. The treating nurse informed the officers that Defendant was lucid; the only evidence before this Court, then, is that Defendant's waiver of rights was knowing, intelligent, and his statement voluntary.

7. Defendant made no challenge to the voluntariness of his second statement except to say that it flowed as a natural consequence from the first.

8. Defendant did not allege that his second waiver of rights was the product of an overborne will or coercion.

9. Defendant introduced no evidence to rebut the presumption of voluntariness that arises from a valid, written waiver of rights under Texas Code of Criminal Procedure Art. 38.22.

10. Defendant has presented no new factual information upon which to base an objection to the voluntariness of his second statement.

11. Defendant's second statement was voluntarily given.

12. Defendant has failed to meet his burden to persuade this Court that either of his statements should be suppressed.

13. Both of the statements were properly admitted during Defendant's trial.

### 3. Discussion

#### a. Appellant's First Statement

Appellant argues—without citation to the record—that he "was under the influence of at least crack cocaine at the time of his first confession and was therefore intoxicated." The evidence regarding appellant's use of cocaine prior to the robbery was introduced during the cross-examination of Detective Thomas Clipper, the officer who interviewed appellant at the hospital and took his first statement. Detective Clipper testified that, pursuant to his investigation, sometime after he took appellant's first statement, appellant told him that prior to the events leading up to the robbery, he had been at home and was using crack cocaine. Detective Clipper testified that before he

6

interviewed appellant at the hospital, he asked appellant's attending nurse (1) whether appellant was sufficiently alert and responsive to give a statement and (2) whether appellant was taking any medication that could make him drowsy or impair his understanding. Detective Clipper was told appellant was able to give a statement. Appellant was given *Miranda* warnings prior to his statement and signed a written waiver of his rights. On cross-examination, Detective Clipper admitted he did not ask the nurse whether appellant was intoxicated or had been drinking any alcohol. Detective Clipper testified that appellant was not impaired when he waived his rights and provided the statement.

We agree with the trial court that appellant voluntarily waived his rights and voluntarily gave his first statement. We overrule appellant's fourth issue.

### b. Appellant's Second Statement

Appellant contends that his second statement was involuntary. Again, without citation to the record, appellant asserts that "[t]he [r]ecord reveals that once Appellant understood that he was being required to give a second confession[,] he immediately exclaimed that he had already given a statement; indicating he did not want to give another statement."

At the beginning of appellant's second statement, Detective Marian Culver stated that she, Detective Clipper, and appellant were present.[1] After Detective Culver read appellant his rights and appellant affirmed that he understood and waived his rights, Detective Culver asked, "Now, do you want to provide a statement to myself and Detective Clipper?" Appellant responded, "I already had gave [sic] a statement." Detective Culver said, "It's your decision." The interview then continued; appellant did not at any time assert or suggest that he did not want to continue the interview.

---

[1] Although appellant's second statement was videotaped, the jury only heard the audio recording.

7

Appellant's counsel objected to the admission of his second statement as follows:

> [Defense counsel]: Your Honor, we would object as [to] the voluntariness of this. Previously when [appellant] gave his statement he had already given one statement when he was, I believe, had cocaine and alcohol in his system. He was already, you know, felt like he was already burned and that's why he executed this one; therefore, we will go ahead and object to the entry of this one.

We disagree that the record shows that appellant "did not want to give another statement." Instead, the record reflects that appellant understood and waived his rights and voluntarily gave the second statement. The trial court did not err in admitting the second statement. We overrule appellant's fifth issue.

## C. Voluntariness Instruction

By his sixth issue, appellant contends the trial court erred in denying his request for an instruction on the issue of the voluntariness of his two statements. Appellant argues that he raised the voluntariness of his statements as an issue, and that the issue should have been submitted to the jury. The State responds that: (1) the trial court did not err in refusing a voluntariness instruction because the issue was not properly raised; and (2) appellant has not shown that he was harmed by the trial court's refusal to give the instruction, and any error, therefore, is harmless.

### 1. First Statement

#### a. Requested Instruction

At the charge conference, appellant's counsel offered a proposed jury instruction regarding the voluntariness of appellant's first statement:

> [Appellant's counsel]: The [defense's] second [requested instruction], Your Honor, is regarding the first confession, Your Honor. We're asking, and we have provided defense proposed jury instruction No. 2, and it states, "You are instructed that under

8

the law, under our law, a statement or confession of the defendant made while he is in custody of the officer shall be admitted into evidence if it appears that same was freely and voluntarily made without compulsion or persuasion."

"Now, if you find from the evidence, or if you have a reasonable doubt thereof that at the time of the statement of the defendant in this case, if such statement was, there was a Detective Clipper, the defendant was under the influence of—" we, I think insert here crack cocaine—"to such extent as to be reduced to a condition of mental impairment such as to render the statement not wholly, not wholly voluntarily [sic], then such statement would not be freely and voluntarily made, and in such case you will wholly disregard the alleged written statement referred to and not consider it for any purpose."

Counsel referred the trial court to: (1) Detective Clipper's testimony that appellant had been smoking crack cocaine before he was arrested; and (2) testimony that appellant was suffering from an untreated gunshot wound, had not been given medication, and therefore, would have been in pain at the time he was interviewed.[2]

Although counsel did not specifically cite section six of article 38.22, the language of appellant's proposed instruction is a paraphrase of the instruction provided for in section six of article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Vasquez v. State*, 225 S.W.3d 541, 543-44 (Tex. Crim. App. 2007) (holding that although appellant did not cite a specific statute as basis for his request, he paraphrased the statutory language provided in article 38.22, section six, and therefore preserved issue as to trial court's denial of instruction). Thus, we conclude that appellant requested a "general" voluntariness instruction under article 38.22, section six.

---

[2] As noted above, appellant was given *Miranda* warnings at the beginning of each statement, and signed a written waiver of his rights as to each statement.

9

*See Oursbourn*, 259 S.W.3d at 181 (holding evidence that appellant was bipolar and in a depressed or manic state raised a "general" voluntariness question under article 38.22, section six, a statutory claim focusing on appellant's subjective mental state).

### b. Discussion

As noted, claims of youth, intoxication, and mental retardation, by themselves, are rarely sufficient to render a statement inadmissible; however, a jury, armed with a proper jury instruction, may consider these factors. *See id.* Entitlement to an instruction under article 38.22, section six does not require a factual dispute. *See id.* at 176. Even if evidence is undisputed that a defendant was "high" on narcotics at the time he gave his statement, "if a reasonable jury could find that the facts, disputed or undisputed, rendered [a defendant] unable to make a voluntary statement, he is entitled to a general voluntariness instruction when he raised a question of the voluntariness of his statement." *See id.*

Here, appellant's counsel pointed to evidence that appellant had been smoking crack cocaine prior to the robbery and had suffered an untreated gunshot wound. We conclude that this evidence raised a general voluntariness question under article 38.22, section six, and the issue of the voluntariness of appellant's first statement should have been submitted to the jury. *See id.* at 181; *Moore v. State*, No. 14-07-00366-CR, 2008 Tex. App. LEXIS 7052, at *16 (Tex. App.–Houston [14th Dist.] Aug. 28, 2008, pet. ref'd) (mem. op., not designated for publication) (finding evidence that appellant was under influence of narcotics when interviewed, even though investigator did not observe signs of intoxication, raised a general voluntariness question, and issue of voluntariness should have been submitted to the jury under article 38.22, section six).

### c. Harm Analysis

In evaluating alleged jury-charge error, we first determine whether error occurred

and then determine whether the error caused sufficient harm to warrant reversal of the conviction. *Abdnor v. State*, 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994) (en banc). In cases where the defendant timely objected to the charge error, we reverse the conviction if the defendant suffered some actual harm as a result of the error. *Id.* at 732; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). In evaluating whether the defendant suffered some actual harm, we consider the entire jury charge as given, the evidence, counsels' arguments, and any other relevant information in the record. *Almanza*, 686 S.W.2d at 171.

We first note that in his brief, appellant does not address whether or how he was harmed by the trial court's refusal to provide a voluntariness instruction as to his first statement. Nonetheless, we conclude he cannot show he was harmed because evidence of his guilt, other than the confession in his first statement, was overwhelming. Officer Trujillo, the first police officer to confront appellant and Limon as the robbery was in progress, testified that when he stepped into the doorway, he saw appellant holding a .357 Magnum revolver to a woman's head. Officer Trujillo testified that appellant fired three shots from the revolver in his direction. According to Officer Trujillo, he heard the shots, saw the "muzzle flash" from the revolver, and "felt something hit [him] in the knee." The .357 revolver was recovered in the bedroom where the shooting occurred. Three fired bullet casings were retrieved from the cylinder of the revolver. In light of the entire record, we hold that the trial court's error in refusing to include a general instruction as to the voluntariness of appellant's first statement did not cause appellant any harm and therefore does not constitute reversible error.

### 2. Second Statement

As to appellant's second statement, appellant's counsel requested the following voluntariness instruction:

And unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the defendant without compulsion or persuasion, or if you have a reasonable doubt thereof, you should not consider such alleged statement or confession for any purpose nor any evidence obtained—nor any evidence obtained as a result thereof.

Appellant's counsel argued to the trial court that the voluntariness of the second statement was raised when appellant commented at the beginning of the second interview "that he'd rather not give a statement, that he had already given a statement and then there's silence." Counsel's argument to the trial court suggested that the officers improperly continued to interview appellant after he indicated that he did not want to give a statement. The trial court rejected counsel's argument, and we conclude that it did not err in doing so. Appellant's actual comment was, "I already had gave a statement," not that he would rather not give a statement.

We have already determined that the trial court did not err in admitting appellant's second statement. Article 38.23(a) states that:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005); *see Contreras v. State*, 312 S.W.3d 566, 573-74 (Tex. Crim. App. 2010). The court of criminal appeals has recently explained when an article 38.23 instruction is required:

The trial court has a duty to give an article 38.23 instruction sua sponte if three requirements are met: (1) evidence heard by the jury raises an issue of fact, (2) the evidence on that fact is affirmatively contested, and (3) the contested factual issue is material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary. A statement is obtained in violation of constitutional due process only if the

12

statement is causally related to coercive government misconduct. Coercive government misconduct renders a confession involuntary if the defendant's "will has been overborne and his capacity for self-determination critically impaired." Whether this has occurred is determined by assessing the "totality of all the surrounding circumstances," including "the characteristics of the accused and the details of the interrogation."

*Contreras*, 312 S.W.3d at 574 (internal citations omitted).

Here, the evidence does not raise a fact issue as to whether appellant requested to terminate the second interview. He did not even assert, as counsel suggested, that he did not want to give a second statement. He simply stated an undisputed fact: that he had already given a statement.

A police officer does not need to stop questioning a suspect "unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996)). Appellant did not invoke his right to terminate the interview—either ambiguously or unambiguously.

We conclude that the trial court did not err in refusing to submit a voluntariness instruction as to appellant's second statement.[3] We overrule appellant's sixth issue.

### III. SUFFICIENCY OF THE EVIDENCE

By his first and second issues, appellant contends the evidence is legally and factually insufficient to support his conviction for attempted capital murder. Specifically, he contends that the evidence is insufficient that he had the requisite intent to commit

---

[3] We note that in *Contreras*, the court of criminal appeals concluded:

*Miranda* or article 38.22, not article 38.23, is the vehicle for excluding statements obtained in violation of *Miranda* guidelines. And because *Miranda* claims do not fall within the ambit of article 38.23, a defendant is not entitled to a jury instruction under that statute. Article 38.22, not article 38.23, is the appropriate vehicle for obtaining a jury instruction regarding a purported violation of *Miranda*, to the extent such a vehicle is available.

*Contreras v. State*, 312 S.W.3d 566, 583 (Tex. Crim. App. 2010). Thus, appellant was not entitled to a voluntariness instruction under either article 38.23 or 38.22.

13

murder. We detail below relevant testimony presented by some of the State's witnesses. The defense presented no witnesses.

## A. Standard of Review

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902-03, 912 (Tex. 2010) (plurality op.). Accordingly, we review claims of evidentiary sufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906-07, 912.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898-99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.–Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In order to prove that appellant committed the offense of attempted capital murder, as alleged in the indictment, the State was required to prove that (1) appellant, (2) either acting alone or as a party,[4] (3) with specific intent to commit

---

[4] Appellant was charged as a party. *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2003) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with

14

an offense (capital murder of Rolando Trujillo, a peace officer who was acting in the lawful discharge of his official duty and who appellant knew was a peace officer), (4) did an act amounting to more than mere preparation (discharging a firearm at Trujillo), (5) that tended but failed to effect the commission of the offense intended. *See* TEX. PENAL CODE ANN. §§ 15.01 (listing elements of criminal attempt); *Yalch v. State*, 743 S.W.2d 231, 233 (Tex. Crim. App. 1988).[5]

A person commits capital murder if he commits murder as defined by section 19.02(b)(1) of the penal code and he intentionally commits the murder in the course of committing or attempting to commit robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). Attempted capital murder, as alleged in the indictment, is a "result of conduct" offense. *Turner v. State*, 805 S.W.2d 423, 430 (Tex. Crim. App. 1991). A "result of conduct" offense means that the accused had to have a particular mind set (i.e., intentional or knowing) to cause the prohibited result. *Richie v. State*, 149 S.W.3d 856, 857 (Tex. App.–Amarillo 2004, no pet.). "Not only must the accused be found to have intended to engage in the act that caused the death, he also must have specifically intended that death result from that conduct; the mere intent to pull the trigger of a firearm will not satisfy the statute." *Turner*, 805 S.W.2d at 430. The jury may infer the requisite intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of the wounds inflicted on the victims. *Yanez v. State*, 187 S.W.3d 724, 742-43 n.13.

intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.").

[5] The indictment alleged, in pertinent part:

CECILIO MENDOZA . . . did then and there, with the specific intent to commit the offense of CAPITAL MURDER of ROLANDO TRUJILLO, a peace officer who is acting in the lawful discharge of an official duty and who the DEFENDANT knows is a peace officer, do an act, to-wit: discharging a firearm at ROLANDO TRUJILLO which amounted to more than mere preparation that tended but failed to effect the commission of the offense intended.

As noted, appellant challenges only the sufficiency of the evidence as to the intent element:  that he intended to murder Officer Trujillo.

## B.  The State's Evidence

### 1.  Officer Rolando Trujillo

Officer Trujillo testified that he responded to an emergency call regarding a home invasion in the early morning hours of February 26, 2007.  As he approached the house, Officer Trujillo said he heard voices inside the house saying that "they were going to start shooting."  Other officers arrived, and the officers lined up and entered the house through an open sliding glass door at the rear of the house.  Once inside the house, Officer Trujillo "took the lead" because he had more experience than the younger officers.  The officers proceeded down the hallway of the residence.  As the officers made their way down the hallway toward the master bedroom where the residents were being held, Officer Trujillo observed two men face down on the floor.  As the officers approached, Officer Trujillo saw a female standing; he also saw an outstretched arm holding a revolver pointed at the woman's head.  Officer Trujillo stepped into the door frame and announced, "Police."  Officer Trujillo saw a second suspect (Limon) holding a handgun.  Officer Trujillo heard one round fired, and he fired also.  According to Officer Trujillo, appellant fired three times in the officer's direction.  Officer Trujillo felt pain in his hands and realized he had been shot.  He stepped outside the bedroom, saw blood coming from his left hand, and saw a finger dangling.  He also felt pain in his abdomen. After composing himself, Officer Trujillo went back into the bedroom and fired one round at Limon, who was on the ground.  Officer Trujillo saw appellant move away; he saw the revolver pointed at him and saw the muzzle flash from the revolver.  He then felt something hit him in the knee and "started buckling down."  As Officer Trujillo was going down, he saw a second and third muzzle flash from the revolver.  Evidence showed that

16

there were three bullet holes in the bedroom door that was behind Officer Trujillo. Officer Trujillo testified that appellant's first shot hit him in the knee. Officer Trujillo was injured in both hands, the abdomen, and the knee. After suffering these injuries, Officer Trujillo dragged himself into a bedroom across the hall. A second officer, Officer John Paul Wright, went into the master bedroom. A third officer, Officer Raymond Rora, assisted Officer Trujillo.

Officer Trujillo identified photographs of injuries that he suffered during the gunfight. He described the injury to his knee as a "slicing wound" across the kneecap, which is consistent with a wound inflicted by a .357 Magnum, the weapon used by appellant.

### 2. Officer Manuel Lucio

Manuel Lucio, an officer with the Brownsville Police Department, testified that three spent bullet casings were recovered from the cylinder of a .357 Magnum found at the crime scene.

On cross-examination, Officer Lucio testified that the .357 Magnum was found on the floor of the master bedroom. At the time it was recovered, the cylinder of the .357 Magnum was open, which rendered the weapon inoperable; however, it had spent casings inside the cylinder and several unfired rounds were found outside the weapon.

### 3. Sergeant Kirk Massey

Sergeant Kirk Massey testified that he was one of the officers who entered the Vallejo residence. After the shooting started, Sergeant Massey went to the back of the house to secure the area. He heard the sound of a window glass breaking in the room where the shooting occurred, and saw a figure jump from the window. Sergeant Massey fired at the suspect, later identified as appellant.

On cross-examination, Sergeant Massey stated he did not know whether

17

appellant was armed when he jumped out the window, and did not know whether he hit appellant when he fired.

### 4. Detective Cris Ortiz

Detective Cris Ortiz testified that he set up a perimeter and secured the area where appellant had escaped. Detective Ortiz apprehended and arrested appellant, who had suffered a gunshot wound to his leg. After appellant was taken to the hospital, Detective Ortiz spoke to him and confirmed that he had waived his rights. Appellant agreed to allow Detective Ortiz to collect samples from appellant's hands for gun-residue testing. Detective Ortiz collected the samples from appellant's hands.

### 5. Thomas Rusk White

Thomas White, a forensic chemist with the Texas Department of Public Safety Crime Laboratory Service, testified that he performed a gunshot-residue test on samples taken from appellant's hands the night of the robbery. White testified that gunshot residue was present in the samples taken from appellant's hands. According to White, a person who had fired a .357 Magnum revolver three times would "more than likely" have gunshot residue on his hands.

### 6. Richard Hitchcocks

Richard Hitchcocks, a forensic firearms and tool mark examiner for the Texas Department of Public Safety Crime Laboratory in McAllen, Texas, testified regarding various firearms retrieved from the crime scene, including the .357 Magnum used by appellant. Hitchcocks testified that, based on his examination of the .357 Magnum, it was impossible to create an unintended discharge of the weapon; in other words, the weapon would not fire unless the trigger was pulled. Hitchcocks testified that the .357 Magnum could not discharge with the cylinder open, but if it were dropped or thrown in such a manner that it struck a surface, the impact could cause the cylinder to open.

18

However, he testified that it was not possible for the weapon to be dropped and discharge three times. Hitchcocks also testified that based on his examination of three .357 Magnum caliber bullets recovered from the master bedroom crime scene, those three bullets were fired from the .357 Magnum revolver that appellant was using. According to Hitchcocks, appellant's .357 Magnum revolver was discharged a minimum of three times.

### 7. Detective Thomas Clipper and Appellant's Statements

Detective Clipper, a detective with the Brownsville Police Department, testified that he was present when appellant was apprehended and taken by EMS to the hospital for treatment. Pursuant to his assignment to investigate the incident, Detective Clipper spoke to the police officers who assisted in stopping the robbery. He was unable to interview Officer Trujillo for several weeks due to Officer Trujillo's injuries.

A couple of hours after arriving at the scene, Detective Clipper went to the hospital and spoke with appellant. He advised appellant of his rights, and appellant waived his rights. Detective Clipper's initial conversation with appellant at the hospital was to learn the identity of Limon, the deceased. From this first conversation with appellant, Detective Clipper learned the identity of the person who introduced appellant to Limon. After following several contacts, the police learned Limon's identity and that two other suspects—the two who dropped appellant and Limon off at the house and remained in the car—were involved in the robbery. Armed with this information, Detective Clipper went to the hospital, read appellant his rights a second time, and showed him photo lineups, from which appellant identified the two individuals in the vehicle.

In the afternoon of the day after the robbery, Detective Clipper went to the hospital a third time to interview appellant. Before conducting the interview, Detective

19

Clipper asked permission from appellant's attending nurse and was told that appellant was alert and responsive.[6] Detective Clipper also asked whether appellant was under the influence of any medications that could impair him from giving a statement and was told that he was not.

After he advised appellant of his rights and appellant waived his rights, Detective Clipper interviewed appellant. The jury was shown the videotaped interview. Bearing in mind that appellant has challenged only the sufficiency of the evidence that he had the requisite intent, we focus only on those portions of the statement related to that issue.

Appellant stated that Limon gave him a gun, the .357 Magnum revolver, to use in the robbery. Appellant recognized Officer Trujillo when he came into the bedroom because Officer Trujillo had been involved with appellant as a juvenile in prior proceedings. Appellant stated, in relevant part:

Q [Clipper]:    Okay. So who shot Officer Trujillo?

A [Appellant]:    Joe.

Q:    Joe shot him? How many times?

A:    I think like three times, and I got scared and I shot mine, too.

Q:    How many times?

A:    Like two or three times.

Q:    Two or three times?

A:    I was scared.

Q:    The revolver—

A:    Yes, sir.

Q:    Did you hit Officer Trujillo?

_____

[6] On voir dire examination by appellant's counsel, Detective Clipper admitted that he did not ask whether appellant was intoxicated or under the influence of alcohol or crack cocaine.

A:          I'm not sure.

Q:          You're not sure?

A:          No, sir.

Q:          Okay.  And then what did you do?

A:          Then I jumped out the window.

        . . . .

Q:          Okay, but you're saying Joe shot him three times, and you shot three times; but you were scared.  So did you hit him?

A:          I don't think so.

Detective Clipper testified that he interviewed appellant the second time on March 2, 2007 at the Brownsville Police Department.  Detective Clipper stated that he advised appellant of his rights and appellant waived his rights.  He also stated that appellant was not under the influence of any drugs or alcohol and did not at any time ask to stop the interview.  An audio-recording of the interview was played for the jury.[7] In the second statement, appellant provided conflicting statements as to what occurred:

A [Appellant]:    And out of nowhere I just heard, ["]Brownsville PD.["] And when I heard, ["]Brownsville PD.,["] I turned around, and when I turned around, Trujillo shot me in the leg. And when Trujillo shot me in the leg, so my friend Joe, he started shooting at Trujillo.  And that's the rest of the cops—

        . . . .

And then, pos,[8] I got scared.  I never aimed at Trujillo.  I

---

[7] Although the interview was video-recorded, and the videotaped statement was introduced for purposes of the appellate record, the jury was not shown the video-recording because of concerns that appellant was dressed in prison attire.  In the second interview, appellant was questioned by Detective Clipper and Detective Marian Culver.

[8] "Pos" is a colloquial variation of the Spanish slang expression, "pues," which, used at the beginning of a sentence, as here, translates roughly as "well."  *See* ELIZABETH REID & LINTON H. ROBINSON, MEXICAN SLANG PLUS GRAFITTI 38 (2003).

21

never shot my gun, but I remember I never shot my gun.

    . . . .

So, when Trujillo, when Trujillo and the rest of the cops started shooting at Joe, so I got scared and threw my gun, jumped on top of the bed and went out the window.

Q [Culver]: Did you fire a gun at any time?

A: No, ma'am.

Q: And it never went off?

A: Hu-uh. It might went off when I threw it to the floor. I don't know. But I never fired the gun.

Q: You never pointed it at anybody?

A: Anybody.

Q: It never went off?

A: It never went off.

Q: Did you pull the trigger?

A: No, ma'am.

Q: Intentionally on purpose or accidental?

A: Maybe I did. I don't remember. I was scared.

Q. Okay. So do you think it went off, or you think it didn't go off?

A: I think it never went off, but I was scared. When I got up, I think the gun went off.

Q [Clipper]: When you got up, what do you mean?

A: When I get up to the bed, got off the floor, too. When I got off the floor and jumped up to the bed, I think the gun went off; but I never aimed [at] Trujillo for nothing.

    . . . .

Q: Do you remember shooting at any time?

22

A:                No, sir.  Maybe I did, but I was scared, and everything was just out of my mind.

Detective Clipper testified that, based on all the evidence, he concluded that appellant fired the .357 Magnum revolver three times.  On cross-examination, defense counsel attempted to show that appellant may have intended to "warn" Trujillo to stop firing.  Detective Culver responded:

> So your question is if he [appellant] fired a round to warn Officer Trujillo? The indications on the door is no.  He aimed at Officer Trujillo.  The only thing that saved Officer Trujillo's life is that his knee did buckle.  He went down.  Because if you see the holes in the door, if he stood upright, Officer Trujillo would have been hit in the—at least the torso area and the neck area.

Appellant did not testify.

## C. Analysis

In his brief, appellant argues the evidence is insufficient to support that he intended to murder Officer Trujillo by shooting at him with a firearm, and points to the following:  (1) Officer Trujillo admitted that he fired first; (2) Officer Trujillo's statement does not assert that appellant fired at him[9]; and (3) in his statements, appellant said he did not believe that he fired at Officer Trujillo and did not know whether he had.

A specific intent to kill is a necessary element of attempted murder.  *Flanagan v. State*, 675 S.W.2d 734, 741 (Tex. Crim. App. 1984).  Intent may be inferred from circumstantial evidence such as the acts, words, and conduct of the appellant.  *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  Intent to kill may be inferred from the use of a deadly weapon, unless it is reasonably apparent that serious bodily injury

---

[9] During cross-examination of Officer Trujillo, appellant's counsel offered in evidence Officer Trujillo's video-recorded statement that was taken by Detectives Clipper and Culver.  Appellant's counsel asserted that the video-recorded statement differed in important respects from Officer Trujillo's trial testimony.  However, in the statement, Officer Trujillo stated that when he felt the shot to his abdomen, he did not know where it came from.  He also stated that when he re-entered the room, he continued to fire at Limon, then felt another impact to his knee, a "powerful blow" that entered one side and exited the other side of his knee.  We are not persuaded that Officer Trujillo's video-recorded statement contradicts his trial testimony.

or death could not result from the particular manner of use. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). A firearm is, per se, a deadly weapon. TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West 2010).

The jury heard evidence that the .357 Magnum revolver used by appellant was fired three times and could not have discharged accidentally. Although appellant gave conflicting statements as to whether he fired or not, the jury could have believed his testimony that he shot two or three times and disbelieved his testimony that he never fired the gun. *See Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (noting that jurors are free to accept or reject any or all of witnesses' testimony).

Viewing all the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient for a rational jury to find appellant guilty of attempted capital murder. We overrule appellant's first and second issues.

## IV. LESSER-INCLUDED OFFENSE INSTRUCTION

By his third issue, appellant contends the trial court erred by denying his request for an instruction on the lesser-included offense of manslaughter.

At trial, appellant's counsel requested the lesser-included-offense instruction as follows:

> Obviously, this would be attempted manslaughter, and we would keep the attempt definition as included in the Court's charge for purposes of the record.
>
> The reason that we are asking for that is during the interview of Mr. Cecilio Mendoza, I think this was the second interview, Detective Culver asked him if he accidentally or he may have accidentally shot at the Officer Trujillo. And at that time he indicated that, yes, he had. He said that he was very scared and then he indicated that he may have shot at the officer. This was during the second interview, Your Honor.

We first note that although appellant gave conflicting statements in the second

24

interview, his counsel's characterization of those statements was somewhat misleading. Appellant did not say that he accidentally shot at Officer Trujillo; when asked if he "[i]ntentionally" or "accidental[ly]" shot at Officer Trujillo, appellant said "maybe" he did—without specifying whether "maybe" applied to intentionally or to accidentally—but did not remember.

Nonetheless, appellant was charged with, and convicted of, attempted capital murder. A person commits an attempt offense if "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *See* TEX. PENAL CODE ANN. § 15.01(a). A person commits manslaughter if he recklessly causes the death of an individual. *See id.* § 19.04(a) (West 2003). A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk. *Id.* § 6.03(c) (West 2003).

For a person to commit an offense under section 15.01(a), the attempt statute, the person must have "the specific intent to commit" the offense attempted. The attempt statute does not apply when the culpable mental state for the offense attempted is less than knowing. *Gonzales v. State*, 532 S.W.2d 343, 345 (Tex. Crim. App. 1976) (noting that it is impossible to specifically intend to recklessly kill another); *Strong v. State*, 87 S.W.3d 206, 217 (Tex. App.–Dallas 2002, pet. ref'd); *Yandell v. State*, 46 S.W.3d 357, 361 (Tex. App.–Austin 2001, pet. ref'd); *see Townsend v. State*, No. 11-05-219-CR, 2006 Tex. App. LEXIS 4929, at **4-5 (Tex. App.–Eastland June 8, 2006, pet. ref'd). Here, appellant's counsel requested an instruction for "attempted manslaughter." Section 15.01(a) does not apply to manslaughter, and the trial court did not err in refusing to give the requested instruction. Appellant's third issue is overruled.

## V. ADMISSION OF EVIDENCE

By his eighth issue, appellant contends that the trial court erred in admitting

25

State's Exhibits 547, 548, 549, 550, and 551. The exhibits are DVDs which depict three-dimensional ("3D") computer-generated representations of the crime scene. Appellant complains the trial court erred in admitting (1) the 3D exhibits as scientific evidence and (2) the testimony of Officer Julio Briones as expert testimony. Officer Briones created the exhibits by using a commercially-available computer software program.[10]

The State responds that: (1) appellant failed to preserve the issue because his objection at trial differed from his argument on appeal; (2) Officer Briones was not testifying as an expert; and (3) the exhibits are demonstrative evidence, which is admissible if it tends to aid the jury in resolving issues relevant to the case.

## A. Standard of Review and Applicable Law

We will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). As long as the trial court's ruling is within the zone of reasonable disagreement and is correct under any theory of law, it must be upheld. *Id.*

## B. Discussion

Assuming, without deciding, that appellant preserved this issue,[11] we conclude that the trial court did not abuse its discretion in admitting the 3D exhibits.

The trial court questioned the prosecutor, "What are you—you utilizing him as an expert to testify about how it was created?" The State responded, "we can utilize

---

[10] Officer Briones testified that he created the exhibits by entering room measurements, the officers' and suspects' locations, and other relevant information into a computer software program. The computer software, Crime Zone, utilizes the information to create a three-dimensional representation of a physical setting. The software was also used to create State's Exhibit 546, a "flat" diagram of the house showing the officers' and suspects' locations.

[11] Among other arguments advanced by appellant's counsel, he argued that, "basically what they are trying to say is that Officer Briones is an expert and he's an expert in using this type of software and it can be relied upon as such."

26

[Officer Briones] as a layperson." Officer Briones testified that he: (1) was familiar with the Crime Zone software used in this case; (2) had used the software on at least two previous occasions and to create State's Exhibit 546, a "flat" diagram of the crime scene; (3) believed the diagrams were to scale; and (4) believed the exhibits would assist the jury in determining what happened the night of the crime.[12]

The State argued to the trial court that Officer Briones was "not testifying as an expert as to gunshot trajectories" and that the exhibits were simply "demonstrative element[s]." The trial court observed that State's Exhibit 546, which was also created by Officer Briones using the same computer software and information, was already admitted in evidence. The court then overruled appellant's counsel's objections and admitted the exhibits.[13]

Diagrams are generally admissible to explain the testimony of a witness and render it more intelligible. *Holding v. State*, 460 S.W.2d 133, 135 (Tex. Crim. App. 1970); *Mayfield v. State,* 848 S.W.2d 816, 819 (Tex. App.–Corpus Christi 1993, pet. ref'd); *see Hartsock v. State,* 322 S.W.3d 775, 778-79 (Tex. App.–Fort Worth 2010, no pet.). Moreover, even if the trial court erred in admitting the 3D exhibits, the improper admission of evidence is harmless if the trial record contains other, properly admitted evidence that is probative of the same matter. *See Saldano v. State*, 232 S.W.3d 77, 102 (Tex.Crim.App.2007). Here, as the trial court noted, State's Exhibit 546 had been

---

[12] The State told the trial court that the 3D exhibits were "not a movie" and "not an animation." Rather, the exhibits were "a to-scale diagram using the Head Zone software called Crime Zone/Crash Zone. It was used to create the diagram that's already been admitted into evidence, and the actual software needed to project it and to run it is on the computer here." Outside the presence of the jury, at the end of the day, the trial court granted defense counsel a continuance to view the 3D exhibits to determine whether the defense "had any other objections." After viewing the exhibits outside the presence of the jury, appellant's counsel stated his desire to "reserve the rest of [his] objections for the morning." The following morning, outside the presence of the jury, appellant's counsel objected to admission of the exhibits on grounds of "reliability," "surprise," and that the exhibits were "highly prejudicial."

[13] The trial court stated that defense counsel "had two objections . . . [t]he continuance and the other one was [Officer Briones's] qualifications or his ability to operate this."

admitted and depicted the same information without the 3D enhancement.  We overrule appellant's eighth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
9th day of June, 2011.